IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

NATIONAL CITY CORPORATION
NON-CONTRIBUTORY RETIREMENT
PLAN, NATIONAL CITY CORPORATION,
and NATIONAL CITY BANK,

      **Plaintiffs,**

v.                //   CIVIL ACTION NO. 1:03CV259
                                (Judge Keeley)

BARBARA FERRELL, EVAN FERRELL,
LAUREN FERRELL, JILL FERRELL-KECK,
FORREST JOHN FERRELL and ADAM FERRELL,

      **Defendants.**

## OPINION

This is an interpleader action filed by the plaintiffs, National City Corporation Non-Contributory Retirement Plan, National City Corporation and National City Bank (collectively, "National City"), to determine which of the defendants is entitled to the proceeds of the late Forrest Ferrell's ("Forrest") pension plan. It presents the question whether a qualified domestic relations order ("QDRO") may be enforced posthumously. Although the Eighth, Ninth and Tenth Circuits have held that they are, this is an issue of first impression in the Fourth Circuit. See Patton v. Denver Post Corp., 326 F.3d 1148 (10th Cir. 2003); Hogan v. Raytheon, Co., 302 F.3d 854 (8th Cir. 2002); Trustees of the Directors Guild of Amercia-Producer Pension Benefits Plan v. Tise, 255 F.3d 661, 2000 U.S. App. LEXIS 38507 (9th Cir. 2000). For the

1

reasons that follow, this Court finds that such QDROs are enforceable.

## I. ERISA'S STATUTORY SCHEME

Forrest, a former National City employee, participated in National City's Non-Contributory Retirement Plan ("Plan"). This Plan is governed by the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., which prohibits the assignment or alienation of benefits provided under a pension plan, except pursuant to a QDRO. 29 U.S.C.A. § 1056(d)(3)(A). Congress amended ERISA to include the exception for QDROs in 1984 "specifically to provide for state-court-ordered assignments of plan benefits to former spouses and dependents." Tise, 2000 U.S. App. LEXIS 38507 at **10 (citing Senate Judiciary Committee, S. Rep. No. 98-575 at 1 (1984)).

A QDRO is a domestic relations order ("DRO") that "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee[1] the right to, receive all or a portion of the benefits payable with respect to a participant under

---

[1] An "alternate payee" is "any spouse, former spouse, child, or other dependent of a participant who is recognized by a [DRO] as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such a participant." 29 U.S.C. 1056(d)(3)(K).

2

a plan." 29 U.S.C. § 1056(3)(B)(i); see <u>Hopkins v. AT&T Global Info. Solutions Co.</u>, 105 F.3d 153 (4th Cir. 1998).

ERISA defines a DRO as any judgment, decree, or order which, "(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependant of a participant, and (II) is made pursuant to a State domestic relations law . . . ." 29 U.S.C.A. § 1056(d)(3)(B)(ii).

When a Plan receives notice that a DRO that may be a QDRO has issued, it

> may take a reasonable period to determine whether the order is a QDRO and therefore creates obligations for the pension plan. While the plan is making this determination, it must segregate the benefits that would be due to the alternate payee under the terms of the DRO during the first 18 months that those benefits would be payable if the DRO is ultimately deemed a QDRO.

<u>Tise</u>, 2000 U.S. App. LEXIS 38507 at **16-17.

If the Plan does not determine the qualified status of a DRO within the eighteen month segregation period, it is directed to pay the funds at issue to the persons designated under the Plan; however, if a QDRO is subsequently issued, the QDRO-holder receives all prospective payments. 29 U.S.C. § 1056(H)(iii)-(iv).

## OPINION

### II. FACTUAL BACKGROUND

#### A. <u>The Ferrells' Divorce</u>

On January 17, 2002, Honorable J. Jeffrey Culpepper ("Judge Culpepper"), Family Court Judge, Monongalia County, West Virginia, entered a DRO finalizing the dissolution of the marriage between Forrest and Barbara Ferrell ("Barbara"). This DRO awarded Barbara one hundred percent of Forrest's benefits under the Plan, and directed her counsel to prepare a QDRO:

> Petitioner is awarded 100% of National City Retirement Plan account as of the date of this entry of this Order and Petitioner's counsel shall prepare a proper instrument to convey same to her whether that be a Qualified Domestic Relations Order or other appropriate instrument.

Thus, under ERISA, as of January 17, 2002, Barbara had a right to the entirety of Forrest's pension plan benefits; however, she was required to prepare a QDRO to enforce that right.

#### B. <u>Model QDROs</u>

More than one year later, on July 14, 2003, Barbara contacted Holly Edwards ("Edwards"), the QDRO Consultant for the Plan, to determine how to obtain a QDRO. According to National City, Barbara informed Edwards that Forrest had participated in the National City Savings and Investment Plan ("Savings and Investment Plan"), and Edwards promised to send her the proper papers.

4

**National City v. Ferrell, et al.**                               1:03CV259

--------------------------------------------------------------------
                              **OPINION**
--------------------------------------------------------------------

Barbara, however, contends that it was Edwards who determined the type retirement plan in which Forrest had participated.

In any event, the parties agree that, the next day, Edwards sent Barbara an e-mail acknowledging the Ferrells' divorce action and providing model language for a Savings and Investment Plan QDRO. Edwards' e-mail specified that "this model QDRO meets the technical requirements for QDROs under Section 414(p) of the Internal Revenue Code" and that Barbara should "feel free to submit the QDRO in draft form prior to its execution with the court. I can pre-approve the language for you in the event it requires further changes or clarification."

Later that day, Barbara's counsel, Phillip Magro ("Magro"), contacted Edwards to discuss the terms of Judge Culpepper's DRO, the requirements for this particular QDRO, and the need for expedited approval. He then prepared a proposed QDRO in accordance with the model provided by Edwards and faxed it to her.

C.   **Six-Month Freeze**

On July 18, 2003, Edwards placed a six-month freeze on Forrest's pension account by submitting a "QDRO Submittal Form for National City Bank" ("Submittal Form"). According to National City, this is an internal Plan procedure designed to protect a person such as Barbara by restricting an employee from receiving

any withdrawals, transfers, loans or distributions under their plan after a draft QDRO has been received.

On the Submittal Form, Edwards indicated that Forrest had participated in both the Savings and Investment Plan and the Non-Contributory Retirement Plan. Later on that same day, however, she received an e-mail stating that Forrest did not have a Savings and Investment Plan account. Consequently, Edwards revised the Submittal Form to delete the reference to that account.

One day earlier, on July 17, 2003, Magro had faxed Edwards an inquiry regarding the status of the QDRO. He received no response from her until July 22, 2003, when she wrote to inform him that she had rejected his proposed QDRO because Forrest had participated in National City's Non-Contributory Retirement Plan, not its Savings and Investment Plan. Two days later, on July 24, 2003, Edwards provided model QDRO language for the Non-Contributory Retirement Plan to Magro, who immediately prepared and faxed a new proposed QDRO in accordance with the model.

D.  **Forrest's Death**

On July 25, 2003, Forrest died without designating a Death Beneficiary. Thus, under the terms of the Plan, his children were eligible to receive his pension benefits by default. The Plan is silent with regard to when the rights of a Death Beneficiary vest;

however, it provides that a "survivor benefit shall be paid or commence to be paid to the Death Beneficiary on the first day of any month after the Participant's death, but in no event later than the December 31 of the calendar year immediately following the calendar year in which the Participant died." The Plan, therefore, provides itself with a window of time in which to determine, <u>inter alia</u>, the identity of the person or persons to whom benefits should be distributed, before it begins making payments.

The Plan did not learn of Forrest's death until August 28, 2003. Meanwhile, on July 28, 2003, Edwards approved the language in Magro's proposed QDRO and directed him to obtain Judge Culpepper's signature and send a certified copy of the signed QDRO to the Plan. She also enclosed a copy of National City's procedures and policies for the review and administration of QDROs. This policy manual provides that the Plan only segregates funds as required by ERISA while the issue of whether a "**'certified'** (ie: signed by the judge) domestic relations order is a qualified domestic relations order is being determined." It further outlines ERISA's provisions regarding the eighteen-month segregation period and prospective application of QDROs qualified subsequent to that period.

**OPINION**

The manual also discusses draft QDROs and the Plan's six-month freeze policy. According to the Plan, a participant does *not* have the right to "apply to receive benefits in accordance with the terms of the plan(s)" unless a "certified" QDRO is not received within the six-month period. Further, it is within a Plan Administrator's discretion to reinstate a six-month hold at any time "if it appears that one of the affected parties is still actively pursuing a QDRO to divide the participant's benefits under the plan(s)." The policy is silent as to the status of this six-month freeze following the death or retirement of the participant.

On August 6, 2003, Judge Culpepper signed the approved QDRO, which provided, in part, that "Barbara Ferrell was entitled to have 100% of the Respondent Forrest Eugene Ferrell's National City Non-Contributory Retirement Plan as of the entry of said Final Order, to wit: January 17, 2002, and that Barbara Ferrell is entitled to a [QDRO] to protect her rights in that retirement plan."[2] On August 7, 2003, Magro submitted the certified copy of the signed order to Edwards. Subsequently, on August 15, 2003, Edwards

---

[2] As the Plan acknowledges, Judge Culpepper's August 6, 2003 QDRO has the same effect as a "nunc pro tunc" order, which recites an action previously taken but not properly or adequately recorded. <u>Cuebas y Arredondo v. Cuebas y Arredondo</u>, 223 U.S. 376 (1912). Thus, the Court finds that Judge Culpepper implicitly intended his QDRO to have a nunc pro tunc effective date of January 17, 2002.

approved Barbara's QDRO, stating that it "does qualify as a QDRO under applicable Federal pension law."

Shortly thereafter, when the Plan became aware of Forrest's death, Edwards wrote to Magro and informed him that it is "the procedure of the Plan Administrator *not* to accept any QDROs that are signed after the death of either the participant or alternate payee" and that "the Plan Administrator will not accept a 'nunc pro tunc' Order."

National City now asks this Court to determine whether Barbara is entitled to the Plan proceeds, or whether Forrest's children should receive the proceeds by default.

## II. LEGAL ANALYSIS

ERISA is silent with regard to the effect of a participant's death on the validity of a QDRO. Nevertheless, a careful review of the statutory framework of ERISA, the relevant caselaw and the terms of the Plan indicates that "posthumous" QDROs may be enforced.

### A. Posthumous QDROs and ERISA

ERISA does not require that a QDRO "be prepared or submitted either at the time of divorce or at any other particular time." Patton, 326 F.3d at 1151 (quoting Gary A. Shulman, Qualified Domestic Relations Order Handbook 54 (1993)). It also does not

require that a DRO be "certified" before a Plan may segregate funds. ERISA, however, does require that a Plan receiving notice of a DRO "segregate funds during *any period* of time in which the question of whether a DRO is a QDRO is at issue." 29 U.S.C. § 1056(H)(i). It then provides an eighteen-month segregation period for such funds "beginning on the date on which the first payment would be required to be made under the [DRO]." Id. § 1056(H)(v) There is no indication in ERISA that this eighteen-month segregation period should be terminated upon the death of a participant or upon the occurrence of any other event.

Moreover, as the Ninth Circuit stated in Tise, ERISA does not suggest that an alternate payee "has no interest in the plan[]until she obtains a QDRO[; it] merely prevent[s] her from enforcing that interest until the QDRO is obtained." 2000 U.S. App. LEXIS 38507 at \*\*16. Thus, "a QDRO only renders enforceable an already-existing interest" and therefore "there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death." Id.

According to Judge Culpepper's August 6, 2003 QDRO Barbara's right to receive Forrest's pension funds ripened on January 17, 2002. Thus, the eighteen month segregation period had already expired. In such circumstances, ERISA provides that a Plan must

## OPINION

"pay the segregated amounts to the person or persons who would have been entitled to such amounts if there had been no order." Id. § 1056(H)(iii)(II). The Plan, however, is not prohibited from determining that a DRO is a QDRO after such payments have been distributed. § 1056(H)(iv). To the contrary, if a Plan later finds that a valid QDRO has issued, ERISA requires it to grant the alternate payee benefits prospectively. § 1056(H)(iv). Thus, ERISA anticipates that a QDRO may alter a person or persons' ability to receive plan benefits even after a Plan has already started making payments to them. It follows, therefore, that a QDRO may alter the ability of certain beneficiaries to receive payments even after the plan participant has died.

National City argues that a QDRO can never alter a Plan's obligation to pay a death beneficiary. In support of this proposition, it relies on the Fourth Circuit's opinion in Hopkins v. AT&T Global Info. Solutions Co., 105 F.3d 153 (4th Cir. 1998). This Court's ruling, however, is entirely consistent with Hopkins.

In Hopkins, a former spouse obtained a DRO granting her the right to receive her retired ex-husband's "Surviving Spouse Benefits" to cover past due child support. The Fourth Circuit found that ERISA prevented the DRO from being "qualified," however, because a current spouse, who is a "beneficiary," not a plan

"participant," under ERISA, has a vested interest in "Surviving Spouse Benefits" upon her husband's retirement. Thus, because a DRO must relate to benefits payable to a "participant" in order to be "qualified," a DRO that is obtained after a "beneficiary's" rights have vested cannot be enforced. Id. at 156 (citing 29 U.S.C. 1056(d)(3)(B)(i)(I)).

The Plan urges this Court to interpret the Hopkins decision as prohibiting "posthumous" QDROs entirely. To interpret Hopkins thusly, however, would render § 1056(H)(iv) meaningless. See Morton v. Mancari, 417 U.S. 535, 551 (1974) (finding that, in cases involving the interpretation of two statutes, the court is obligated to construe the statutes in a way that enables each to be effective); see also Watt v. Alaska, 451 U.S. 259, 267 (1981) (directing courts to read conflicting statutes "to give effect to each if we can do so while preserving their sense and purpose"); and Sec. Indus. Ass'n v. Bd. of Governors of Fed. Reserve Sys., 468 U.S. 137, 176 (1984) (O'Connor, J., dissenting) (finding that construing a federal law to implicitly repeal another law is "a last resort . . . and must be avoided where an interpretation of the statutory language is available that is consistent with legislative intent and that shows the conflict to be merely

apparent and not real"). Further, such an interpretation is unnecessary.

Section 1056(H)(iv) allows for prospective payments because, as mentioned previously, a DRO that meets the definition of "qualified" creates an alternate payee's right to receive plan benefits as of the date specified in the QDRO. That right is unenforceable, however, until a QDRO is obtained, i.e., until *the Plan determines* that it is a QDRO. So long as a court has issued such a QDRO, however, it may be enforced at any time. In such a circumstance, therefore, a QDRO is not "posthumous" at all. It is only being *enforced* posthumously. Thus, at that point, Plan beneficiaries do not have a "right" to plan benefits that can "vest." They only have the ability to receive payments under the Plan until the QDRO-holder chooses to enforce her pre-existing right to such payments.[3]

---

[3]In reaching its decision in Hopkins, the Fourth Circuit relied heavily on ERISA's provisions governing joint and survivor annuity and Surviving Spouse Benefits, concluding that:
> The fact that a participant can replace a joint and survivor annuity -- along with its Surviving Spouse Benefits -- only during the ninety-day period prior to retirement, and only with the consent of the current spouse, is further evidence that the participant's spouse at the time of retirement has a vested interest in the Surviving Spouse Benefits. Even more telling is the fact that, after retirement, a participant cannot change the distribution of plan benefits, even with the current spouse's approval.

Forrest Ferrell, in contrast, as an unmarried participant, had the

**OPINION**

Applying this concept to the present case, Barbara would be able to obtain a "posthumous" QDRO because Judge Culpepper's August 6, 2003 QDRO relates back to his January 17, 2002 DRO. Thus, his August 6, 2003 QDRO effectively granted Barbara rights to Forrest's pension benefits prior to Forrest's death.

Accordingly, this Court holds that a QDRO that grants an alternate payee an interest in a participant's pension benefits on a date prior to that participant's death is posthumously enforceable under ERISA. Otherwise, as the Seventh Circuit has observed

> [i]f an alternate payee's right to ERISA plan proceeds were automatically cut off once an event occurred that, absent an enforceable QDRO, would make the proceeds payable to someone else, then a plan participant's retirement, the vicissitudes of court scheduling, or a plan participant's death, all events beyond the control of the alternate payee, could determine the parties' substantive rights. However, Congress [did not mean] to ask the impossible, not the literally, but the humanly, impossible, or to make a suit for legal malpractice the sole recourse of an ERISA beneficiary harmed by a lawyer's failure to navigate the treacherous shoals with which the modern state-federal law of employee benefits abounds.

---

right to designate or change his Plan beneficiary at any time. In point of fact, his children are only eligible to receive his Plan proceeds because he failed to make such a designation. Thus, unlike a current spouse or the recipient of a QDRO, Forrest's children cannot claim to have had any vested legal interest in the Plan proceeds prior to his death.

## OPINION

Metropolitan Life Ins. Co. v. Wheaton, 42 F.3d 1080, 1085 (7th Cir. 1994) (citations omitted).

**B. Nunc Pro Tunc Orders**

The Court's finding also applies regardless of the Plan's policy not to accept nunc pro tunc orders. Although ERISA allows a Plan to adopt procedures for determining the "qualified status" of a DRO and "to administer distributions under such qualified orders," it also requires that such policies be "reasonable." 29 U.S.C. § 1056(G)(ii).

In her August 28, 2003 letter, Edwards informed Magro that, by policy, the Plan did not accept nunc pro tunc orders. Such a policy is unreasonable, however, given that federal courts must give full faith and credit to state court orders, including their nunc pro tunc effective date. See 28 U.S.C. 1738 (requiring that "judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken"). See also Tise, 234 F.3d 415, 2000 U.S. App. LEXIS 38507; IBM Savings Plan v. Price, 349 F. Supp. 2d 854, 858 (D. Vt. 2004); and Payne v. GM/UAW Pension Plan, 1996 U.S. Dist. LEXIS 7966 (E.D. Mich. May 7, 1996) (unpublished) (finding "no authority to support the proposition

that a QDRO is invalid if it is inconsistent with the divorce judgment, or if it is amended after the participant's death," and, further that the amended QDRO "was entered nunc pro tunc to a date prior to Donald's death [and therefore] was not made after death.") Further, ERISA does not expressly prohibit such orders.

In this case, the QDRO entered on August 6, 2003 clearly states that "Barbara Ferrell was entitled to have 100% of the Respondent Forrest Eugene Ferrell's National City Non-Contributory Retirement Plan *as of the entry of said Final Order, to wit: January 17, 2002,* and that Barbara Ferrell is entitled to a [QDRO] to protect her rights in that retirement plan." Regardless of the "procedure" of the Plan, therefore, this Court is required by federal law to give full faith and credit to the QDRO entered on August 6, 2003, including its nunc pro tunc effective date.

The Plan argues that such a ruling does not consider ERISA's goal of providing certainty and efficiency in the administration of Plan benefits. As the Fourth Circuit stated in Hopkins, however, "ERISA and the terms of the plan, and not matters of administrative convenience, determine a person's pension rights . . ." 105 F.3d at 157. Further, "it is worth noting that [the Court's] holding does not burden the efficient management of the plan." Id. Nunc pro tunc orders are not entered on an ad hoc basis. To the

**OPINION**

contrary, "[a] decree nunc pro tunc presupposes a decree allowed or ordered, but not entered through inadvertence of the court, or a decree under advisement when the death of a party occurs." <u>Cuebas y Arredondo v. Cuebas y Arredondo</u>, 223 U.S. 376 (1912).

> The function of such an order is to supply an omission in the record of action previously taken by the court but not properly recorded . . . Briefly stated, the purpose of a nunc pro tunc order is not to change or alter an order or judgment actually made. In other words its function is not to make an order now for then, but to enter now for then an order previously made.

<u>George v. Sullivan</u>, 909 F.2d 857, 860 (6th Cir. 1990) (quotations omitted). Nunc pro tunc "is merely descriptive of the inherent power of the court to make its records speak the truth -- to record that which was actually done, but omitted to be recorded." <u>W. F. Sebel Co. v. Hessee</u>, 214 F.2d 459, 462 (10th Cir. 1954)).

"Post-death (or post-retirement) entry or modification of a decree may reasonably occur in a variety of circumstances, including, e.g., clerical error, appeals, and delays attendant on the formulation of an appropriate order." <u>Samaroo v. Samaroo</u>, 193 F.3d 185, 193-94 (3d Cir. 1999) (Mansfield, Cir. J., dissenting).[4]

---

[4]Judge Mansfield further stated:
There is good reason to allow state courts some leeway in entering or modifying domestic relations orders even after a participant's death, or retirement, or other status-altering event. The state courts are charged with administering the important, and often complex and volatile, area of domestic relations law.

OPINION

This is precisely what occurred in this case. Judge Culpepper's August 6, 2003 QDRO did not award new rights to Barbara. It merely restated the rights granted to her in the DRO issued on January 17, 2002 in terms that the Plan would find enforceable pursuant to ERISA. Accordingly, under the Full Faith and Credit Clause, Judge Culpepper's August 6, 2003 QDRO must be respected and, pursuant to § 1056(iv), Barbara is entitled to receive Forrest's pension benefits prospectively.[5]

---

> The evident purpose of ERISA's recognition of QDROs is to avoid undue interference with state courts' fulfillment of that charge. Imposing a cut-off date by which a state court's orders must be in prescribed form -- a cut-off that does not appear anywhere in the text of ERISA -- would unnecessarily impede those courts' efforts to provide for a just disposition of marital assets.

Samaroo, 193 F.3d at 194.

[5] During the interval between July 25, 2003, the date Forrest died and the present, the Plan made no payments to Forrest's children. In point of fact, the Plan had not even determined the *identity* of the Death Beneficiaries before it approved Barbara's QDRO on August 15, 2003. Thus, even had Forrest's children been able to receive plan proceeds on July 25, 2003, they cannot receive such benefits now. Similarly, had the Plan previously made payments to Forrest's children, Barbara's right to those payments would be unenforceable even though she had a legally enforceable interest in them prior to Forrest's death. Accordingly, Barbara is now entitled to receive one hundred percent of the assets in Forrest's pension fund.

### III. CONCLUSION

Because a valid QDRO may be enforced posthumously, the Court awards Forrest Ferrell's pension benefits to Barbara Ferrell.[6]

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: August ___31___, 2005.

IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE

---

[6]Beyond ERISA, the Plan's policy to place a six-month freeze on a participant's account when it receives a draft QDRO provides an alternative ground to award Barbara one hundred percent of the proceeds of Forrest's pension plan. As mentioned earlier, during this six-month time period, a participant does not have the right to apply to receive benefits in accordance with the terms of the Plan. A Death Beneficiary, however, can only inherit the rights that the participant himself possessed at the time of his death. It follows, therefore, that if a participant dies before the six-month freeze has expired, the beneficiary has only inherited a right to receive benefits if a certified copy of a QDRO is not received by the Plan at the culmination of that six-month period. Here, Edwards placed a six-month freeze on Forrest's pension account on July 18, 2003. The Plan received a certified copy of Judge Culpepper's QDRO on August 7, 2003, well within that six month time frame. Thus, the Plan's own provisions also support a finding that Barbara should receive the entirety of Forrest's pension funds.